**CROCKETT v. UNITED STATES.**
**CROCKETT v. McELROY et al.**

Nos. 4638, 4639.

Circuit Court of Appeals, Fourth Circuit.

Dec. 21, 1940.

Joseph M. Sanders, of Bluefield, W. Va. (Sanders & Day, Franklin K. Day, Jr., and Frank L. Smoot, all of Bluefield, W. Va., on the brief), for appellant.

Howell M. Tanner, of Bluefield, W. Va., and Charles M. Love, Jr., Asst. U. S. Atty., of Charleston, W. Va. (A. J. Lubliner, of Bluefield, W. Va., and Lemuel R. Via, U. S. Atty., and John W. Hereford, Asst. U. S. Atty., both of Huntington, W. Va., on the brief), for appellees.

Before DOBIE and NORTHCOTT, Circuit Judges, and H. H. WATKINS, District Judge.

**NORTHCOTT, Circuit Judge.**

In November, 1939, in the District Court of the United States for the Southern District of West Virginia, George H. McElroy instituted a civil action against Central Motor Sales Company, a corporation, J. C. Crockett, Robert Holt, Frank Ellison and Peter A. Hanna, to recover damages for personal injuries sustained by him on February 20, 1939, when an automobile alleged to have been operated by Frank Ellison and Robert Holt as the agents and representatives of Central Motor Sales Company, a corporation, and J. C. Crockett, collided with an automobile being operated by McElroy. Said collision was alleged to have resulted in severe injuries to McElroy and the demolition of the car operated by him. McElroy was an employee of the Federal Bureau of Investigation and the car operated by him was owned by the United States of America. The United States also instituted a civil action against the same defendants to recover damages to said automobile. A car operated by Peter A. Hanna, following the McElroy car, was also involved in the collision and Hanna was alleged to have been injured.

J. C. Crockett filed an answer in both cases, admitting that on the day of the ac-

cident he was trading and doing business as Central Motor Sales Company, but denied that said business was incorporated; and further alleged that he was the owner of the automobile which collided with the car being driven ·by McElroy, and that said automobile at the time of said accident was being operated by Frank Ellison, but denied that the said Frank Ellison or Robert Holt, another occupant of said car, were his agents or representatives, or engaged in any business for him at the time of said accident, and disclaimed any liability.

Peter A. Hanna filed a written answer denying any negligence on his part, and alleged that the sole cause of the accident was the joint negligence of McElroy and J. C. Crockett, Robert Holt and Frank Ellison. The answer further alleged that Hanna suffered personal injuries and property damage in said collision, and set up a counter-claim for said damages against McElroy, Crockett, Holt and Ellison.

· On the day of trial, in January, 1940, Herbert Holt, improperly sued as Robert Holt, filed an answer setting forth that his correct name was Herbert Holt; that at the time of said accident he was riding in the Plymouth sedan owned by Crockett, but that he was not driving said car, and that at the time of said accident he was not acting as the agent or representative of J. C. Crockett, and was not engaged in any business for J. C. Crockett.

It was agreed by and between counsel for McElroy, Hanna, the United States of America, Crockett and Holt that said cases might be consolidated and heard together, and this was done by a proper order.

After the introduction of evidence on behalf of McElroy and the United States, Hanna, Crockett and Holt moved for directed verdicts, which motions were denied. Crockett and Holt then introduced their evidence and Hanna introduced his evidence and adopted the same testimony given on behalf of McElroy and the United States as to Holt being an agent of Crockett. Motions for directed verdicts were again overruled and after argument, and the charge of the trial judge, the case was submitted to the jury which returned the following verdicts: A verdict in favor of Hanna on McElroy's claim against Hanna; a verdict in favor of McElroy on Hanna's counter-claim against McElroy; a verdict in favor of Hanna on Hanna's counter-claim against Crockett, Holt and Ellison for the sum of $3,116.50; a verdict in

favor of McElroy against Crockett, Holt and Ellison for $2,795.33; and a verdict in favor of the United States of America against Crockett, Holt and Ellison for $575.

Thereupon Crockett and Holt moved to set aside the verdicts and grant them a new trial, and to enter judgment in their favor notwithstanding the verdicts, which motions were overruled and judgment was entered in accordance with the verdicts. From this action J. C. Crockett brought this appeal, and is the sole appellant.

The accident occurred about four p. m., approximately one mile east of the corporate limits of the town of Princeton, West Virginia. McElroy, an F. B. I. agent, operating a car owned by the United States, was driving in a westerly direction toward the town of Princeton and Hanna was also driving in the same direction, closely following the car driven by McElroy. The evidence was to the effect that as McElroy ascended a slight hill he observed a truck approaching from the opposite direction and almost instantaneously a car, following close behind the truck, and travelling at a high rate of speed, attempted to pass the truck and collided with the car being driven by McElroy. The car operated by Hanna crashed into the rear of the McElroy car. Both McElroy and Hanna were injured and their cars damaged. The appellant, Crockett, does not question the fact that the negligence of Ellison, the driver of the Crockett-owned car, was the proximate cause of the accident.

Crockett was at that time engaged in the business of selling new and used cars at Princeton, under the name of Central Motor Sales. Ellison was not an employee of the appellant, Crockett. Other occupants of the Crockett-owned car, at the time of the accident, were Robert Weikel, who was riding on the front seat next to Ellison, Vergie Keatley, who was sitting on the front seat next to the right door and Herbert Holt who was lying in the rear seat. All of the occupants of the automobile were intoxicated, and Holt was either asleep or unconscious.

Holt had been in Crockett's service as automobile salesman for approximately one year prior to the accident, and was still in his service at the time of the trial. Holt did not have regular working days or hours and was not paid a salary but worked on a commission basis. He had the right to use appellant's automobiles for business purposes but did not have the right to use

them for his own personal pleasure and convenience; when he had a prospect for a sale he would talk the matter over with Crockett and get his, Crockett's, permission to take the car out to demonstrate it; he had authority when demonstrating cars to prospective purchasers to allow them to drive the cars.

Prior to the day of the accident, Holt had a prospect for the sale of a car at Hiawatha, West Virginia. About nine o'clock on the morning of the accident, Holt inquired of Crockett whether he should take the car and go to see the prospect, and Crockett said he thought this would be a good idea. Holt then secured the keys to the car and drove it out of appellant's garage, intending to go to Hiawatha but did not go there, instead he drove the car down the main street of Princeton and met Frank Ellison, whom he had known for several years. Ellison got in the car and Holt asked him, Ellison, about one of Holt's prospects, for the purchase of a car, in Monroe County. They had talked about fifteen or twenty minutes when Robert Weikel came up and joined them. Ellison and Weikel were old friends but Holt had not met Weikel. Ellison testified that Holt tried to interest Weikel in a new De Soto car, but Weikel did not appear to be interested. Weikel then produced a bottle with liquor in it and Ellison, Holt and Weikel began to drink the liquor. After they consumed the liquor they had, they proceeded to the liquor store in Princeton and Ellison went in and purchased more liquor with money furnished by Weikel. During the course of the drinking, there was more talk between Holt and Weikel about Holt selling Weikel a car. They again went to the liquor store to secure another supply of whiskey and Holt testified that this was the last he remembered until he regained consciousness after the accident.

There is contradiction in the evidence as to whether Holt asked Ellison to drive the car after he, Holt, began to become intoxicated; Ellison testifying that about noon Holt asked him, Ellison, to drive but that he replied that he did not have an operator's license and that he, Ellison, said let Bob (Weikel) drive, and Bob started driving. Weikel drove the car to a sandwich shop, where beer was sold, located on the Princeton-Beckley highway, where they were joined by a woman, Vergie Keatley, who was also intoxicated.

None of the occupants of the car remembered where they went after leaving the sandwich shop until the time of the accident.

There is little or no dispute as to the facts, and the proximate cause of the accident was clearly shown to be the negligence of the drunken occupants of the Crockett-owned car. Appellant, Crockett, did not testify at the trial.

The sole question involved is whether, under the circumstances, the appellant, Crockett, is liable for the damages caused by the accident.

■ The liability of the appellant depends upon the law of West Virginia. Hudson et al. v. Moonier, 304 U.S. 397, 58 S.Ct. 954, 82 L.Ed. 1422. An examination of the West Virginia decisions shows some conflict. In Shahan v. Jones et al., 115 W.Va. 749, 177 S.E. 774, the syllabus (which in that state is the law of the case) reads as follows: "In an action against the owner of an automobile for damages resulting from its negligent operation by another, the issue of whether the driver was, at the time of the injury, the agent of the owner, may be submitted to the jury upon the denial of the driver and owner and substantial countervailing evidence or circumstances."

■ In Cochran v. Michaels, 110 W.Va. 127, 157 S.E. 173, 175, there is an able discussion of this question. In the opinion the Court says: "It is apparent that at the time of the accident the driver was not engaged directly in defendant's business, in a narrow and restricted sense; but, as we have seen from Mechem, the rule of respondeat superior is not limited by such a restriction. See, also, Cooley on Torts (3d Ed.) § 1027 (*632). It may be conceded that the driver did not even intend to further the master's business by the course he was pursuing at that time; but his mental attitude alone is not controlling. Riley v. Oil Company, 231 N.Y. 301, 132 S.E. .97, 22 A.L.R. 1382; 39 C.J., supra, § 1475. The real test is 'in the relation which the act done bears to the employment.' Mechem, supra, § 1880. Much of the driver's information as to prospective purchasers necessarily came through his friends and acquaintances. One purpose of his 'roving commission' was evidently to allow him to visit at will among his friends and acquaintances in search of this information. It is reasonable that the defendant had

this in mind in giving the driver permission to pick up friends. A friend picked up became an eager informant as well as a partisan of the driver, and the interest of the defendant was thus promoted. Authority to pick up friends impliedly included permission for the driver to put aside momentarily the direct search for purchasers in order to serve the friends. It is a common trait of servants to usurp authority, in the absence of the master. Knowledge of this trait is chargeable to the defendant, as an employer of labor. Mere abuse of authority by the servant does not sever the relation of master and servant. Labatt, supra, § 2277; 39 C.J., supra, § 1476. It is not necessary that the defendant should have anticipated the exact circumstances surrounding this accident. It is sufficient if it was probable that the driver would at times exceed his express authority and carry a friend (a greater or less distance) solely as an accommodation to the friend. Mechem, supra, § 1884. We are of opinion that such an act of accommodation was a natural consequence of the broad powers conferred on the driver, and that the defendant should have anticipated that at some time some place the driver would do just that thing. If so, the act which occasioned the plaintiff's injury was within the scope of the driver's employment, and the defendant is responsible for that act."

The first syllabus in this case is as follows: "Whether an act by a servant is within the scope of his employment is determined by the relation which the act bears to the employment."

One of the latest decisions of the Supreme Court of Appeals of West Virginia on this question, which we have been able to find, is Miller v. Douglas et al., 5 S.E. 2d 799, where the court held that whether an employee of a garage owner had authority to grant permission for the use of an automobile, so as to render the garage owner liable, was a question of fact for the jury under the evidence.

In Tolbert v. Jackson, 5 Cir., 99 F.2d 513, it was held that when a bailor rents an automobile to a person known by the bailor to be drunken and irresponsible, to be driven on the crowded streets of a city, the bailor is responsible for an injury caused by the negligent driver. This principle applies with greater force to the relationship of principal and agent.

The appellant relies chiefly upon the cases of Coates v. Auto Sales Co., 106 W.Va. 380, 145 S.E. 644; Meyn v. Dulaney-Miller Auto Co., 118 W.Va. 545, 191 S.E. 558; Jenkins v. Spitler, 120 W.Va. 514, 199 S.E. 368 and Shrimplin v. Simmons Auto Co., Inc., W.Va., 9 S.E.2d 49. An examination of these cases shows that they are not "on all fours" with the instant case as to the facts. In the Meyn v. Dulaney-Miller case [118 W.Va. 545, 191 S.E. 563], the agent used the owner's car solely for his own pleasure, in attending a picnic at night, and the court held the owner not liable because the agent was on a "frolic of his own". The Jenkins case holds the owner not liable while the employee was operating the automobile on his own business or pleasure; and in the Coates case the owner of the automobile was held not liable because at the time of the accident the servant was off duty and in the Shrimplin case the facts are entirely different from those here.

It seems to us clear that the great weight of the West Virginia authority is to the effect that where there is any substantial question as to the liability of the owner for the negligence of the agent, or anyone acting under the agent, the question is one of fact for the jury.

█ On the question of the sufficiency of the evidence to take the case to the jury, the federal courts are not bound by the decisions of the state courts. As was said by Judge Parker of this court, in Gorham v. Mutual Benefit Health & Accident Association, 4 Cir., 114 F.2d 97, 99, decided August 22, 1940: "Furthermore, while according great respect to decisions of state courts in the matter of direction of verdicts, we are of opinion that this is a matter which is governed by federal practice, and not one wherein local law or local decisions are binding. It goes to the very essence of the exercise of the judicial function by the federal courts, and is in no sense a matter of local law."

Should we reach the conclusion that the evidence was not substantial enough to support a verdict against the appellant we would not hesitate to set the judgment aside but, as we shall set out, we are satisfied that there was sufficient evidence to support the verdict.

We have here a case in which an agent was placed in charge of one of an owner's cars, invested not only with the privilege

of demonstrating and selling this car to a certain prospective customer, but also invested with the general privilege and discretion to seek out other prospective customers not only for the particular car in question but for other types of cars that the owner then had in stock or thereafter might acquire. One of the privileges as well as duties of the salesman was to advertise the owner's business, to seek out prospective customers to whom either immediate or future sales might be made or sought to be made. In the instant case the salesman called on a friend and acquaintance who had previously furnished him information as to prospective customers and who introduced him to such an one. This prospective customer was invited into the car along with the salesman and his friend for the specific purpose of promoting the owner's business, and it is unimportant from a legal viewpoint whether the salesman's efforts were successful or not. Weikel, the prospective customer, was taken into the car in order to advertise and promote the owner's business and this business was repeatedly discussed between the parties for sometime. The testimony as to how frequently the business was mentioned was given by witnesses antagonistic to appellees in this case, as was also the testimony regarding what else occurred between the time that Weikel was invited into the car and the time the accident occurred. Certain admitted facts, however, stand out in bold outline: The invitation extended to Weikel was within the scope of Holt's authority; Holt continued from time to time, so long as he remained conscious, his efforts as salesman; the beginning of the drinking bout which ultimately resulted in the accident was the indulgence in a practice well known and all too frequent as a means of promoting fellowship and sales; Holt had general authority to invite others to drive Crockett's cars for the purposes of demonstration and in the way of advertising sales generally; both Ellison and Weikel had been requested by Holt to drive the car involved in the accident and Weikel had driven the car prior to the accident, and while Ellison who was driving the car when the accident occurred had at first declined to do so because of his not having a driver's license, it is clear that his subsequent change of mind was, or would have been, in harmony with Holt's wishes and within the privilege previously extended; the evidence shows that whether he lost consciousness, as contended by himself and his companions or not, Holt the effective agent of Crockett remained in the car throughout the day with the right to direct its movements, and with the right to put it in charge of either Weikel or Ellison, and that it was driven at the time of the accident with his implied authority and consent; during the whole day Holt's agency demanded of him the custody of the car with its eventual return to the owner, and in the interval the return of his assistant in advertising and his prospective customer to where he originally contacted them.

■ It was the duty of Crockett in the selection of Holt as his agent to use reasonable care to ascertain his competency to drive a car and the existence of habits which would make it unsafe to place so dangerous an agency in his charge. The owner owed a duty to the public to know something about the character and habits of an employee in whose charge he placed an automobile. A rapid moving and heavy vehicle becomes highly dangerous when negligently operated. It is evident from the readiness with which Holt engaged in the drunken carousal so early in the morning that he must have been a man of inebriate habits and that Crockett in whose employ he had been for a year or more before the accident either knew or was charged with the duty of knowing this fact, which is further emphasized both by the continued employment of Holt after the accident for approximately a year and up to the time of the trial (whether longer or not we are not advised), and by the further fact that Crockett refused to take the stand, thereby entitling the jury to indulge in all reasonable presumptions against him. Holt's agency was not one limited by certain specific instructions, it was an agency coupled with wide discretion, and it is especially true that if Crockett knew, as he should have known, and as the jury had every right to assume that he knew, of Holt's habits, he is certainly to be charged with a result which might reasonably have been anticipated at the hands of a drunken employee. Under the facts of this case Holt throughout was acting within the scope, or apparent scope, of an agency charging his employer with liability.

■ Our newspapers are filled with daily accounts of automobile wrecks re-

sulting in serious injuries and deaths at the hands of drunken drivers, some as owners and others as employees. Surely the courts are not called upon to encourage or license this deadly menace because forsooth the owner of a motor vehicle may relieve himself of liability in the employment of an agent of inebriate habits of which he has failed to make inquiry; or upon the claim of lack of responsibility for an act of such agent. The question arises when and where did Holt's agency cease? And when did his duties cease? Were they either discharged or ended by his beginning to drink to excess, or by his "passing out" as the result of such indulgence, thereupon rendering his possession of the car committed to him by the owner more dangerous? It would be a queer doctrine to assert that by rendering himself more effective in doing damage to an innocent public an agent may discharge his duty to the master, and relieve the master of liability at the very point of becoming most dangerous. The accident occurred during the usual working hours of the day, while Holt was still in possession of the car and sometime before the hour at which cars turned over to selling agents are customarily expected to be returned to the master's place of business. In the decided cases there is a clear line of distinction between those in which the agent goes on an independent carousal or enterprise of his own during business hours in which his possession is lawful, and in other cases in which the car is used for a pleasure trip entirely unconnected with the master's business from beginning to end, and those in which after the master's business has been completed and the agency terminated, the employee uses the car for his own pleasure. The question of agency is one of fact and the conflict, or apparent conflict, of decisions by the courts of last resort may generally be traced to an effort to accord proper weight to the controlling facts of each case.

We are in accord with the view that stricter legislation governing cases of this type might well be enacted. We are satisfied, however, that the general principles of law now prevailing are sufficient to support our view of the instant case. Certainly we are not disposed to extend the protection of the law to offenders in cases of this sort beyond what past authoritative decisions require.

The charge of the trial judge, to which there was no objection, was more than fair to the appellant, and he repeatedly instructed the jury to the effect that they must believe from the evidence that at the time of the accident the car was being operated on the business of the appellant, or had some proper connection with appellant's business, before they could find a verdict against the appellant.

We have repeatedly held that courts are loath to invade the province of the jury when, as in the instant case, there is substantial evidence to support the finding of the jury on a question of fact, we can only affirm that finding and the judgment based thereon.

There was no error in the trial harmful to the appellant, and there was substantial evidence to sustain the verdict of the jury.

Affirmed.

DOBIE, Circuit Judge (dissenting).

I regret that I cannot concur in the majority opinion in these cases. As these cases seem to me highly important and, further, since the field of liability for injuries received in automobile accidents (particularly when the relation of agency is involved) is one of increasing public concern, I am setting forth, probably at greater length than is customary in dissenting opinions, reasons for the legal faith that is in me.

Crockett, at the time of the accident, was engaged in the business of selling new and used cars at Princeton, under the name of Central Motor Sales. Holt had been in Crockett's service as an automobile salesman for approximately one year prior to the accident and Holt was still in Crockett's employ at the time of the trial. Holt had no regular working days or hours; he received no regular salary, working on a commission-sales basis, upon the sales of Crockett's automobiles negotiated by Holt. It seems that Holt worked when, as, and if he so desired. Holt had no authority whatever to use any automobile of Crockett for his own personal pleasure or convenience. When Holt secured the name of a prospect, who might become a purchaser of one of Crockett's cars, he would always first talk the matter over with Crockett and would then secure Crockett's permission to take a car out for the purpose of demonstrating this car to the particular prospect. Holt also had

authority, when he was demonstrating a car to a prospective purchaser, to permit the prospect to drive the car, when it seemed that this might help in effecting a sale of a car to a prospect. Though the evidence on this point is not altogether clear, it seems that we might imply that Holt, when he was sent out to demonstrate a particular car to a specific prospect, also had authority to try to make helpful contacts with, and to endeavor to sell either the particular car he was driving or other cars of Crockett to, persons, other than the specific prospect, when Holt thought these persons might purchase a car from Crockett.

Prior to the day of the accident, Holt had contacted a prospect for the sale of a car, a Mr. Hale, who lived at Hiawatha, West Virginia. About nine o'clock on the morning of the accident, Holt inquired of Crockett whether Holt should take the car in question over to Hiawatha in order that Holt might see this prospect with the hope of selling this car to the prospect. Crockett replied that he thought this would be a good idea. Holt then secured the keys to the car and drove the car, a Plymouth sedan, out of the appellant's garage. After leaving the garage, Holt never took any step whatever either to drive the car to Hiawatha or to get in touch with his prospect. Instead, Holt drove the car down to the Virginian Railroad Station in Princeton. There Holt met Ellison, whom he had known for several years. Ellison got in the car and Holt inquired of Ellison concerning a man in Monroe County, West Virginia, who was a prospect of Holt's for the sale of a car.

Holt and Ellison talked about fifteen or twenty minutes, when Weikel came up and joined them. Ellison and Weikel were old friends, but Holt had not previously known Weikel. Holt tried to interest Weikel in the sale of a new De Soto car; but Weikel manifested no interest whatever in such a sale. Holt, it might be noted, made no attempt to sell Weikel the particular car involved in the accident, and none of the driving of this car was ever in the nature of an effort to demonstrate this car to either Weikel or Ellison. Weikel then produced a bottle of liquor, whereupon Ellison, Holt and Weikel began upon a course of what turned out to be rather sincere drinking. After the liquor in this bottle had been consumed, the three proceeded to the liquor store in Princeton, where Ellison went in and purchased more liquor with money furnished by Weikel. During the course of the drinking (at about eleven A. M.), there was some more somewhat futile and rather desultory talk between Holt and Weikel about the possibility of the sale of a car to Weikel. Later, another supply of liquor was purchased at this liquor store and Holt seems to have remembered nothing from the time shortly after this second purchase of liquor until after the accident.

Though the evidence on this point is not altogether clear, it seems that Holt asked Ellison to drive the car after Holt began to feel the effects of the liquor he had consumed. This appears to have been about noon. Ellison replied that he did not have a license as the driver of an automobile. Ellison then suggested that Weikel be permitted to drive and Weikel started driving the car. There is nothing in the record to show that Holt ever afterwards renewed his invitation to Ellison to drive the car. Weikel then drove the car to the DeLuxe Sandwich Shop, where beer was sold, located on the Princeton-Beckley highway. The proprietor of this shop testified that the party reached his shop sometime between noon and one o'clock.

When the shop was reached, Weikel and Ellison, who were then quite drunk, got out of the car and went into the shop. Holt did not get out of the car, he was unable to do so; for he was then lying in the rear seat of the car, completely unconscious, as a result of the liquor he had drunk. Weikel and Ellison stayed in the shop about fifteen or twenty minutes. There they persuaded a woman by the name of Vergie Keatley to accompany them in the car to a place kept by one Gooch Harris, where cabins were rented to passing motorists. Weikel, Ellison and Vergie Keatley all testified that they were going to the Harris place to "throw a party". Vergie Keatley was then drunk and the evidence showed that an attempt was made to persuade two other women to go on this party, but that these two women declined this generous invitation because Ellison, Weikel and Vergie Keatley were obviously drunk. While Ellison and Weikel were in the shop, making plans for the afternoon, Holt was lying on the back seat of the car, dead to the world; so he, of course, was not consulted, and could have nothing to say, about this new and somewhat independent party which was to be thrown at the Harris place.

At a time between three-thirty P. M. and four P. M., Ellison started out driving the

car from the sandwich shop in the direction of the Harris place. Weikel was then sitting next to Ellison on the front seat of the car; Vergie Keatley was on the front seat, to the right of Weikel, next to the door on the right-hand side of the car. During the course of the drive from the sandwich shop in the direction of the Harris place until the happening of the accident, Holt remained unconscious on the back seat, utterly oblivious to, and taking no part whatever in, what was going on. We think it should be repeated in this connection that the last desultory conversation between Holt and Weikel on the subject of the sale of a car, took place around eleven A. M., at least one hour before the car arrived at the sandwich shop, and about five hours before the happening of the accident. It is important, too, we think, that the particular journey in the course of which the accident happened was one undertaken by Ellison, Weikel and Vergie Keatley, solely for the personal pleasure and enjoyment of these three.

On these facts, we are called on to decide if there was sufficient evidence to take the case to the jury on the question of whether or not, at the time of the accident, the car was being driven within the scope of the authority of an agent or servant of Crockett, so as to render Crockett liable for the consequences of the accident. In other words, should the trial judge have directed the jury to bring in verdicts in favor of the defendant, Crockett, on the ground that there was not substantial evidence tending to show that at the time of the accident the car was being driven in the course of the business of Crockett?

A number of West Virginia cases have been cited bearing on the problem of the liability of the owner of a motor car for injuries inflicted on third persons when the car of an owner is entrusted to an agent or servant. It is my opinion, however, that no single one of these cases, even if it be interpreted most liberally against the defendant in the instant cases, has gone so far as to lay down any rule or principle under which the defendant Crockett can be held liable in the cases now before us. Some discussion of the more important of these cases, however, would seem to be proper and in order.

In Meyn v. Dulaney-Miller Auto Company, 118 W.Va. 545, 191 S.E. 558, the court held that the agent or servant, Scanlon, was acting within the scope of his employment and the defendant was held liable to the plaintiff. We think this case, however, can clearly be distinguished from our case, for in the Meyn case the accident occurred at a time when the agent was returning home after inspecting the employer's place of business. In the course of the opinion we find (191 S.E. at page 561): "Scanlon had the right to use the car in question in going to, and returning from, his work. He also had the right to use it and other used cars for his company's business and his own pleasure."

Unlike Scanlon, Holt had no right to use the car in question in going to, and returning from, his work, and he had no right to use Crockett's cars for his own pleasure; nor did Holt, as did Scanlon, receive any regular salary. Attention might also be directed to the case of Ritter v. Hicks, 102 W. Va. 541, 135 S.E. 601, 50 A.L.R. 1505, and the case of Jenkins v. Spitler, 120 W.Va. 514, 199 S.E. 368, in which the Meyn case was cited with approval.

In Shrimplin v. Simmons Auto Company, W.Va., 9 S.E.2d 49, 53, while the facts are somewhat different from the Crockett case, the court used in its opinion, some rather significant language: "True, Chenoweth was continuously in the employ of the defendant, but he was not exercising that employment during the afternoon in any effort to make a sale to or trade with the plaintiff. *We think there must be some limitation upon the authority of a servant, even while within the scope of his employment, in inviting people to ride in an automobile under his control, when such invitation has no connection with the business in which he is then engaged. An invitation, proper at the time made, cannot be held to continue long after the consummation of the purpose which prompted it. Any new invitation must rest upon the circumstances then existing.* We are of opinion that when the plaintiff accompanied Chenoweth during the afternoon of May 26, when he was engaged in business of his company with which plaintiff was in no way associated, he no longer had the protection contemplated by the original invitation." (Italics ours.)

In connection with the Shrimplin case, it is worthy of note that whatever may have been the situation in the Crockett case had the accident happened before Holt became intoxicated, and that whatever power, if any, Holt might have had to take third parties into one of Crockett's cars while he was driving it, yet, after Holt became drunk, the drive from the sandwich shop

toward the Harris place was in the nature of a new and independent journey, undertaken in the car by Ellison, Weikel and Vergie Keatley, in which Holt played no part whatever beyond lying unconscious on the back seat of the car. On that journey, when the accident in question happened, no possible benefit could have been conferred on the master, and nothing could or would be done that might, even in any remote way, help the master or his business.

Appellees relied heavily upon Cochran v. Michaels, 110 W.Va. 127, 157 S.E. 173, 175, and particularly upon this language in the opinion: "It is apparent that at the time of the accident the driver was not engaged directly in defendant's business, in a narrow and restricted sense; but, as we have seen from Mechem, the rule of respondeat superior is not limited by such a restriction. * * * It may be conceded that the driver did not even intend to further the master's business by the course he was pursuing at that time; but his mental attitude alone is not controlling. * * * The real test is 'in the relation which the act done bears to the employment.' * * * Much of the driver's information as to prospective purchasers necessarily came through his friends and acquaintances."

But this language must be construed in the light of the following excerpt from that same opinion: "One purpose of his 'roving commission' was evidently to allow him to visit at will among his friends and acquaintances in search of this information. It is *reasonable that the defendant* had this in mind in giving the driver permission to pick up friends. *A friend picked up became an eager informant as well as a partisan of the driver, and the interest of the defendant was thus promoted. Authority to pick up friends impliedly included permission for the driver to put aside momentarily the direct search for purchasers in order to serve the friends.* It is a common trait of servants to usurp authority, in the absence of the master. Knowledge of this trait is chargeable to the defendant, as an employer of labor. Mere abuse of authority by the servant does not sever the relation of master and servant. * * * It is not necessary that the defendant should have anticipated the exact circumstances surrounding this accident. It is sufficient if it was probable that the driver would at times exceed his express authority and carry a friend (a greater or less distance) solely as an accommodation to the friend. * * * We are of opinion that such an act of accommodation was a natural consequence of the broad powers conferred on the driver, and that the defendant should have anticipated that at some time some place the driver would do just that thing. If so, the act which occasioned the plaintiff's injury was within the scope of the driver's employment, and the defendant is responsible for that act." (Italics ours.)

It could hardly be said that the authority conferred by Crockett would impliedly include any such journey as that undertaken by Ellison, Weikel and Vergie Keatley on a frolic of their own, when Holt, the only person in the car who sustained any legal relation whatever to Crockett, lay during all of this journey unconscious on the back seat of the car. Nor can it be contended with fairness, we think, that "the defendant should have anticipated that at some time, some place, the driver would do just what he did". In the Cochran case, too, the evidence amply warrants the assumption that the driver in that case had authority much broader than that given by Crockett to Holt. We think this last observation is true also in the case of Shahan v. Jones, 115 W.Va. 749, 177 S.E. 774. Miller v. Douglas, W.Va., 5 S.E.2d 799 is not at all in point.

The case of White v. Firestone Tire & Rubber Co., 4 Cir., 90 F.2d 637, decided by this Court, is not directly in point, for in that case, the agent drove the car over to a football game on his own initiative and as an independent undertaking of his own; but some of the observations contained in the opinion of Judge Watkins in that case, I think, do lend countenance to the view I have reached in the instant case.

We have been asked to affirm the judgment in this case on the theory that the owner of a car owes to the public a legal duty to know something about the character and habits of an employee in whose charge the owner has placed an automobile, which is certainly a dangerous instrumentality when carelessly operated. Or, to state the principle in somewhat different form, we are asked to hold that when an employer knows, or should know, of the bibulous habits of an employee and when, with such knowledge, the employer turns over a car to such an employee for the purposes of the employer, the employer is liable for injuries suffered by third persons when such

an employee comes under the influence of liquor. It may well be that a statute enacting such principles, or similar ones, may subserve a sound public policy; but there are no such statutes in West Virginia. Nor has my attention been called to any decision in West Virginia (or elsewhere, for that matter) laying down principles quite so broad. In the absence of such statutes or decisions, I do not feel justified in laying down these broad principles and then deciding this case in the light of them.

In this connection, it is not without importance that the record contains no evidence that Crockett either knew or should have known of Holt's addiction to drink, with the exception of the proven fact that Holt was still in Crockett's employ at the time of the trial. Surely this is consistent with the idea that it is human to err, divine, to forgive; and that Crockett was willing to forget and forgive this one instance of Holt's slipping from grace. And the record is altogether barren of any evidence showing, or even tending to show, that Crockett knew, or should have known, that Holt was a careless or reckless driver of automobiles.

Three important cases in this field may be briefly discussed. In Forrester v. Jerman, 67 App.D.C. 167, 90 F.2d 412, 414, Associate Justice (now, happily, Chief Justice) Groner was very careful to point out that he was applying a specific Act of Congress, called the Automobile Responsibility Law, D.C.Code Supp. II 1936, T. 6, § 255b, for, near the end of his opinion, he said: "The section in the act *creating the new liability* goes a step further and makes the person to whom the owner has lent the automobile the agent of the owner, and the result of this is to make the owner liable, upon analogy to the principles of agency, for an injury negligently inflicted by a person using the automobile with his consent." (Italics ours.)

In Department of Water & Power, etc. v. Anderson, 9 Cir., 95 F.2d 577, 582, Circuit Judge Haney said: "If one intrusts his automobile to another, knowing that the latter is an incompetent, reckless, or careless driver, and likely to cause injuries to others in the use of the automobile, the owner is negligent. * * * The owner, of course, would be liable in such case for any injuries proximately caused by such negligence." See, also, Priestly v. Skourup, 142 Kan. 127, 45 P.2d 852, 100 A.L.R. 920, 923; 5 Am.Jur. 686, § 355; 2 Restatement

of the Law of Torts, p. 1058 § 390. This holding would seem to require that the intrustor must have actual knowledge that the intrustee is incompetent, reckless or careless as a driver and is likely to cause injuries to others. There was, as has been observed, no evidence to support such a finding in the instant case. Holt was not driving the car at the time of the accident and was, as we have seen, totally oblivious of the fact that the car was being driven by Ellison on a "joy ride".

In Tolbert v. Jackson, 5 Cir., 99 F.2d 513, it was held that when a bailor, rents an automobile to a person known by the bailor to be *then* a drunken and irresponsible person, and when the bailor knows, too, that the bailee would drive this car in the bailee's drunken and irresponsible condition upon the populous streets of the City of Atlanta, such a bailor is liable when the negligent driving of the bailee caused the wrongful death of a pedestrian. Here, there was actual knowledge by the bailor of the drunken condition of the bailee; there was also actual knowledge by the bailor that the drunken bailee would engage in the hazardous undertaking of driving the car through the streets of a large city. The bailor actually knew that the situation was loaded with dynamite and that under the circumstances existing when the bailment was created, injuries to third persons were more than likely to occur.

There was no evidence in the instant case to show that Holt had taken a single drink when Crockett entrusted the car to Holt. There was no evidence, either, indicating any likelihood that Holt would become drunk after Crockett entrusted the car to him; there certainly was nothing to show any high probability of injury to anyone as a result of Holt's driving this car to the somnolent village of Hiawatha, demonstrating the car there to the prospect and then returning with the car to Princeton. And Crockett, when he entrusted his car to Holt, must have had in contemplation only such a trip from Princeton to Hiawatha and return.

Before the drinking began at the Virginian Railway Station, Holt did speak to Ellison, seeking information about one of Holt's possible prospects in Monroe County. Holt also attempted to interest Weikel in the purchase of a car other than the car Holt was then driving, and Holt did mention this subject again to Weikel out on the road; but all the conversation on this sub-

ject ceased about five hours before the happening of the accident. Weikel manifested no interest whatever in the purchase of any car from Holt, so that Holt's hope of selling a car to Weikel must have been very close to the absolute zero of science.

Again, the real purpose of the occupants of the car, after Weikel came into the picture, was to engage in the drinking of intoxicating liquor and for that purpose to drive the car from place to place. The liquor in question was furnished by Weikel, or bought with his money; so that the agent was not entertaining the prospect for the purpose of making a sale, but the agent was willingly working on the liquor furnished by the possible (?) prospect. Any conversations among the three, Holt, Ellison and Weikel, concerning the sale of a car, was merely incidental to the drinking purpose of the trip, and, in my opinion, these conversations at best amounted to nothing more than a scintilla of evidence tending to show that Holt was engaged in the business of his master. The scintilla doctrine does not apply in the federal courts. Particularly does this seem to be true, when an attempt is made to project these cursory conversations in the morning concerning possible sales of cars over into the trip in the afternoon; for then Ellison was driving, Weikel was on the front seat next to the woman who had been picked up, and Holt was lying on the back seat, utterly unconscious of all that was going on around him.

Ellison was asked (record, p. 91): "What was the purpose of all this riding that you men were doing from nine o'clock in the morning until about two-thirty in the afternoon? What was your purpose in it?" He replied: "Well, we were just out to drink; that was all; just drinking; did not have any particular purpose." Holt was asked (record, p. 152): "Now, during this trip that you took with Ellison and Weikel, during that day from nine o'clock in the morning until the hour this accident occurred, just what was your purpose in riding around with these men?" His reply was: "To drink whiskey." And to the next question; "Was that the sole purpose?", he replied: "That was all." Weikel was asked (record, p. 108): "Where were you headed when this accident happened? Where were you going?" He answered: "Really, I don't know where." To the next question, "If you were sober, why didn't you know?", his answer was: "I didn't ask any questions, I was just riding." And to the question: "Just joy-riding?" he replied: "Yes, sir."

Accordingly, before the time of the accident, the three men and the woman who had been picked up, had started out on a new journey to a new destination, for purposes solely connected with their own pleasure, and it was on this journey that the accident happened. Holt alone bore any legal relation to Crockett. Ellison and Weikel from a legal viewpoint were utter strangers to Crockett. I do not see how, under these circumstances, it can properly be contended that the unconscious salesman was at the time of the accident, engaged in the business of the employer, or that any advantageous purpose of the master could possibly be served by this drunken joy-ride. Again, I do not think it could truthfully be said that when Crockett turned this car over to Holt, with express directions to drive the car to Hiawatha in an endeavor to sell the car to Hale, Crockett could ever have had in contemplation any such use of the car as was being made of it at the time when the accident happened.

In the light of what has been said above, I think the trial judge erred when he refused to direct verdicts in favor of the defendant, Crockett. Accordingly, I believe that the judgments of the District Court in these cases should be reversed and that these cases should be remanded to the District Court with directions, under Federal Rules of Civil Procedure, 50 (b), 28 U.S.C. A. following section 723c, that judgments be entered in that court in favor of the defendant, Crockett.