IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2020 Term

**FILED**
**November 20, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 19-0200

ROOF SERVICE OF BRIDGEPORT, INC.,

Defendant Below/Petitioner

v.

ROBERT JOSEPH TRENT and CHARLOTTE TRENT,

Plaintiffs Below/Respondents

Appeal from the Circuit Court of Harrison County
The Honorable Christopher McCarthy, Judge
Civil Action No. 16-C-333-3

AFFIRMED

Submitted:  October 6, 2020
Filed: November 20, 2020

Ancil G. Ramey, Esq.                    Scot S. Dieringer, Esq.
Steptoe & Johnson PLLC                   Clarksburg, WV
Huntington, WV                           Counsel for Respondents
Counsel for Petitioner

JUSTICE WORKMAN delivered the Opinion of the Court.

CHIEF JUSTICE ARMSTEAD AND JUSTICE JENKINS dissent and reserve the right to file separate opinions.

SYLLABUS BY THE COURT

1.     "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review.  We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a *de novo* review."  Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

2.     "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence."  Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp*., 159 W.Va. 621, 225 S.E.2d 218 (1976).

3.     "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."  Syl. Pt. 4, *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998).

4.     "The appellate standard for review for an order granting or denying a renewed motion for judgment as a matter of law after trial pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure [1998] is *de novo*."  Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

i

5. "When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the West Virginia Rules of Civil Procedure [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party." Syl. Pt. 2, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009).

6. "In determining whether there is sufficient evidence to support a verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syl. Pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981 (1984).

7. "An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable." Syl. Pt. 3, *Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981).

8. "Whether an act by a servant is within the scope of employment is determined by the relation which the act bears to the employment." Syl. Pt. 1, *Cochran v. Michaels*, 110 W.Va. 127, 157 S.E. 173 (1931).

9. "An act specifically or impliedly directed by the master, or any conduct which is an ordinary and natural incident or result of that act is within the scope of employment." Syl. Pt. 2, *Cochran v. Michaels*, 110 W.Va. 127, 157 S.E. 173 (1931).

10. "There are four general factors which bear upon whether a master-servant relationship exists for purposes of the doctrine of *respondeat superior*: (1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative." Syl. Pt. 5 *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990).

11. "An injury incurred by a workman in the course of his travel to his place of work, and not on the premises of the employer, does not give right to participation in such [Workers Compensation] fund, unless the place of injury was brought within the scope of employment by an express or implied requirement in the contract of employment of its use by the servant in going to and returning from work." Syl. Pt. 2, *De Constantin v. Pub. Serv. Comm'n,* 75 W.Va. 32, 83 S.E. 88 (1914).

12.     "Where an injury is of such character as to be obvious, the effects of which are reasonably common knowledge, it is competent to prove future damages either by lay testimony from the injured party or others who have viewed his injuries, or by expert testimony, or from both lay and expert testimony, so long as the proof adduced thereby is to a degree of reasonable certainty.  But where the injury is obscure, that is, the effects of which are not readily ascertainable, demonstrable or subject of common knowledge, mere subjective testimony of the injured party or other lay witnesses does not provide sufficient proof; medical or other expert testimony is required to establish the future effects of an obscure injury to a degree of reasonable certainty."  Syl. Pt. 11, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974).

13.     "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption."  Syl. Pt., *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977).

iv

WORKMAN, Justice:

The Petitioner, Roof Service of Bridgeport, Inc. (hereinafter "Roof Service"), appeals from an order denying its motion for judgment as a matter of law or, in the alternative, for a new trial entered on February 15, 2019, by the Circuit Court of Harrison County, West Virginia, following a jury trial in a personal injury action brought by the Respondents, Robert Joseph Trent and Charlotte Trent (hereinafter "Mr. and/or Mrs. Trent"). The action arose from an incident on June 9, 2015, when Mr. Trent, while at the sidewalk by the street in front of his home, was severely injured when he was struck and run over by a truck owned and operated by Bruce Wilfong, a foreman and employee of Roof Service. Mr. Wilfong was backing his truck down the sidewalk for the purpose of retrieving scrap metal debris from the roof project that Roof Service had contracted with Mr. and Mrs. Trent to perform on their home. Following deliberation, the jury returned a verdict finding that Mr. Wilfong was acting within the scope of his employment and apportioning one hundred percent of the fault for the incident to Mr. Wilfong. The jury awarded $181,000 in largely stipulated medical expenses; $250,000 for Mr. Trent's past, present, and future physical pain, mental anguish, and emotional distress; $250,000 for Mr. Trent's present and future loss of enjoyment of life; and $250,000 for Mrs. Trent's loss of spousal consortium.

Roof Service timely filed its post-trial motion and it is from the order denying the motion that Roof Service appeals raising five assignments of error that we address in turn. First, Roof Service seeks remand for entry of judgment as a matter of law in its favor.

1

Second, in the alternative, it seeks to have the verdict set aside and the matter remanded for a new trial. Finally, in the alternative, it seeks a remand for remittitur of damages.

Having considered the record, the various briefs submitted, the relevant law, and the oral arguments presented, we find no error in the circuit court's denial of Roof Service's motion for judgment as a matter of law or, in the alternative, for a new trial, or for remittitur.

## I. FACTS AND PROCEDURAL HISTORY

On September 9, 2016, Mr. and Mrs. Trent filed suit grounded in claims of negligence against Roof Service, Mr. Wilfong, as an agent and employee of Roof Service, and John Cole, individually and as owner, operator, employer, and supervisor of Mr. Wilfong. The action arose from an incident on June 9, 2015, when Mr. Wilfong struck and backed over Mr. Trent with his vehicle thereby allegedly resulting in painful, serious, and permanent bodily injury to Mr. Trent for which Mr. Trent sought compensatory and general damages. Mrs. Trent sought damages for the loss of comfort, care, and consortium of her husband. Mr. Cole filed a motion to dismiss for failure to state a cause of action against him on the grounds that as President of Roof Service no action or omission was claimed against him. Roof Service filed an answer generally denying the claims, admitting that Mr. Wilfong was an employee, but denying that he was an employee at the time of the incident, and specifically asserting that Mr. Wilfong was not acting within the scope of his

2

employment at the time of the incident. Roof Service also filed a cross-claim against Mr. Wilfong. Subsequently, Mr. Wilfong filed answers generally denying the claims.

On December 18, 2017, the parties, by joint stipulation, agreed to dismiss Mr. Cole from the action. Mr. and Mrs. Trent settled their claims with Mr. Wilfong and he was dismissed from the action on January 23, 2018. Subsequently, the circuit court denied Roof Service's motion for summary judgment on September 11, 2018, finding that material questions of fact existed regarding the argument that Mr. Wilfong was not acting within the scope of his employment or was an independent contractor at the time of the injury to Mr. Trent. The matter then proceeded to trial by jury.

Inasmuch as the assignments of error and the jury verdict require evaluation of the evidence adduced at trial and consideration of the inferences to be drawn from the evidence, we briefly summarize the trial proceedings.

Officer Gregory Todd Collins, a police officer with the City of Bridgeport, West Virginia, testified that he was dispatched to the scene and upon arrival, he saw the truck and observed Mr. Trent on the ground with his legs partially on the sidewalk and his upper body in the street. He made an accident report diagram of the scene depicting the placement of the truck and the position of Mr. Trent on the ground. Officer Collins took a statement from Mr. Wilfong and attached it to his accident report. Mr. Wilfong stated that he was backing up on the sidewalk and Mr. Trent came through his yard and onto the

sidewalk behind the truck such that he did not see Mr. Trent and hit him. Officer Collins discussed the narrative section of his accident report which indicated that Mr. Wilfong was attempting to back his truck onto the yard to load scrap metal from the construction at the residence of Mr. and Mrs. Trent. Mr. Wilfong drove past the residence and started to back the truck up onto the sidewalk when he heard yelling, stopped, and found Mr. Trent on the ground. Mr. Trent reported that he had been across the street moving the neighbor's trash cans from the road because they were out-of-town. He saw a truck coming down the street and, after it passed by, he crossed to return to his home. Mr. Trent described having stepped up onto the sidewalk when he was struck and knocked to the ground. On cross-examination, Officer Collins agreed that a pedestrian has a duty to use due care and look both ways when crossing a street. Officer Collins also agreed that as he stepped up to the sidewalk, Mr. Trent should have been able to see the truck and therefore agreed Mr. Trent "had to have been violating basic due care." However, on re-direct, Officer Collins also agreed that a person is not normally supposed to look for a truck driving backwards down a sidewalk. He also agreed that Mr. Trent did nothing wrong. Officer Collins testified that he found Mr. Wilfong at fault for improper backing of the truck and gave him a warning for the conduct.

Mr. Wilfong testified that he and Mr. Cole had been good friends for some thirty-five years. He is a foreman for Roof Service and worked on the job at Mr. and Mrs. Trent's residence the day of the incident. At the conclusion of the workday, Mr. Wilfong returned the Roof Service vehicle and got his 2003 pick-up truck with a camper cab on the

4

bed of the truck which he conceded can impair vision when driving backwards. He returned to the jobsite to pick up scrap aluminum. He stated that he squared his truck up, kept his eyes on the street and the sidewalk and slowly backed up. He did not see Mr. Trent. He heard Mr. Trent yelling and found him on the ground with his head on the sidewalk. Mr. Wilfong called 911 and then called Mr. Cole. Mr. Wilfong believes he was not at fault for the accident. Although he did not see Mr. Trent anywhere at the time of the incident, he blamed Mr. Trent for "walking behind a moving vehicle."

Mr. Wilfong testified that part of the job of roofing requires the removal of all debris. However, he stated that he does not retrieve and remove the scrap metal for Roof Service. He retrieves the scrap metal to take it to the junk yard where he is paid for it. He keeps the money and does not give any portion of it to Roof Service. He does it on his own time, for his own benefit, and Roof Services has nothing to do with his picking up scrap metal. If he did not want the scrap metal, it would be thrown in the jobsite dump truck with other waste material.

John Cole, the President of Roof Service, testified that part of the agreement with Mr. and Mrs. Trent was to remove old roofing, clean up, and haul away debris. Mr. and Mrs. Trent paid to have the whole job completed including the removal of trash and debris. He remarked that it is a typical part of any roofing contract and job that before you leave the jobsite, the yard and property is all cleaned up. As foreman, Mr. Wilfong's responsibilities include making sure the job is done in accordance with the customer

5

contract including removing debris. He testified that Mr. Wilfong asked him some twenty years ago if he could have the scrap metal from the roofing jobs. According to Mr. Cole, he told Mr. Wilfong he could have the scrap, but he had to do it on his own time and with his own vehicle. Over the years, it had become the custom for Mr. Wilfong to gather the scrap metal from the jobsites. Mr. Wilfong makes the decision on every job as to whether debris goes to the dump or he takes it. Mr. Cole testified: "I allowed him to do it—as long—as long as the yard got cleaned up. And that was our contract—cleaned up and hauled away." Mr. Wilfong is not paid by Roof Service for time spent retrieving the scrap metal.

According to Mr. Cole, one "could say" that Mr. Wilfong was an independent contractor in terms of the activities of scrap metal retrieval. He acknowledged that nobody informed Mr. and Mrs. Trent that the foreman on the Roof Service job was an independent contractor for purposes of removing debris. Mr. Cole agreed that during his deposition he acknowledged that the customary arrangement with Mr. Wilfong increased the amount of money Mr. Wilfong made and that he referred to it as a bonus or a reward for working as an employee of Roof Service some thirty-five years. He remarked: "[a]nd if someone works for you for thirty-five years you ought to reward them."

On the day Mr. Wilfong backed his truck into Mr. Trent, he called Mr. Cole who went to the scene and saw Mr. Trent laying in the street behind the truck. Mr. Cole

6

agreed that the diagram made by Officer Collins was "fairly accurate" in its depiction of the placement of Mr. Trent's body.

Mrs. Trent testified that on the day Mr. Trent was struck by the truck she was recuperating from knee replacement surgery at a rehabilitation hospital and she was wondering why her husband had not been to see her because he came every day. Her nephew came to the hospital and informed her what happened, got a wheelchair and took her to the emergency room where she saw her husband as he was being prepared for transfer. She was upset upon seeing Mr. Trent on a back board with a neck brace and receiving oxygen. She relied heavily on her brother to check on Mr. Trent and to take care of things for her during her thirty-three-day hospitalization.[1] She testified that after Mr. Trent was returned to Clarksburg for rehabilitation, he suffered in excruciating pain, was disillusioned, did not know where he was, could barely move his leg, and his arm was immobilized.

According to Mrs. Trent, her husband has greatly deteriorated, lost a lot of weight, has no energy, and is unable to do many of the things he used to do in the home and the yard. He is unable to go to the cemetery to decorate family graves for the holidays.

---

[1] Mrs. Trent's brother, Ed Tomes, testified and generally supported the testimony of Mrs. Trent. Mr. Tomes testified regarding the hospitalization and rehabilitation services Mr. Trent received. He also testified that Mr. Trent never fully recovered and never returned to his prior activity level. Mr. Tomes explained that Mr. Trent has walking difficulties and cannot fully lift his injured elbow.

He must use a quad cane for walking. He has been deprived of his primary daily activity of walking with friends at the mall for an hour and a half. Now, he can only walk a few feet before he needs to stop and rest. Due to walking limitations, he received a handicap parking tag. Mr. Trent can no longer take the garbage can to the street for trash pick-up. Due to his mobility limitations, she has stopped going to Sunday school before church in order to drive her husband, drop him off at the front door, and then go park so that they can attend the later church service together. She said that Mr. Trent is very unsteady and not the same person since the incident. They gave up their almost three decades of attendance at WVU football games due to his inability to climb the stadium stairs. She testified that Mr. Trent continues to have trouble with basic things such as buttoning his shirts due to the elbow and arm limitations. The elbow and arm limitations have caused him to be unable to sketch and draw as he used to enjoy. His ability to continue doing crossword puzzles has been affected because he has to brace the arm and elbow to work the puzzles and sign his name. She now does the bill paying and check writing because it is difficult for him to write. Although he had shoulder arthritis before the injury, he never complained and had no limitations.

Mrs. Trent testified that her husband never fully recovered. She talked about his inability to sleep many nights a week since the injury. At night, she will find him out of bed sitting in the family room because the wreck is on his mind. He told her that "every night when he goes to bed, he closes his eyes, he can see that truck over him, because the truck backed over him. He could see the underneath of the truck." She explained that the

8

worry and stress over the wreck is on his mind all the time and she believes it has contributed to his fifty-pound weight loss. She stated that even at his age of eighty-one at the time of the injury, her husband was not an old man and could probably outwalk sixty-year-old people.

On cross-examination, Mrs. Trent took issue with some of the entries in medical records regarding her husband's progress. For instance, Mrs. Trent disputed entries in physical therapy notes indicating that Mr. Trent could walk 500 to 1,000 feet several months after the accident based upon her own observations. She agreed that he had issues walking, lifting and carrying heavy items several years before the incident but testified that those problems were resolved well before the incident with the placement of stents. Mrs. Trent acknowledged that her husband had pre-existing arthritis.

Mr. Trent testified regarding critical facts as to where he was located, what he was doing, and what happened at the time he was struck as follows:

> Well, I was waiting on a delivery of medicine for my wife, who was in HealthSouth, it was a medicine to prevent osteoporosis and it had to be refrigerated.
>
> So I was waiting for FedEx to deliver it, so I could rush it over to the hospital, and have them put it on ice, so it would be ready when she needed it.
>
> In the meantime, I saw across the street that our neighbors, the Bonassos, who I knew went out of town, had left their green garbage can out. I thought, well, that's not a good idea for them to be out of town, and that can sitting there. It indicates

that they're out of town. And people will maybe take advantage of it.

So I went over and took the can, wheeled it around the house to where they always keep it. Put it in a little nook that they had there.

Came back around the house, two cars passed me. I went across the street, was standing on the sidewalk, looking for the FedEx truck, when all of a sudden I had this terrible impact to my back.

When I started to go backwards, I started to fall, I could see under the vehicle. When I went down I was screaming, or yelling, and the car stopped.

It turned out to be a truck. The pickup truck stopped. And, when it did, it kind of thrust me out, it spit me out.

And so I—when I landed, I could see that my arm was in really bad shape. It was almost like a Z, and I knew it was in bad shape.

When the driver of the vehicle came around and said, I didn't see you there. And that's the only thing that I remember him saying.

Mr. Trent testified regarding his broken thumb, fractured pelvis, broken elbow, and injuries to his back. Surgery was performed on the elbow. He required blood and spent eight days in the hospital before being transferred to the rehabilitation facility where, upon an examination by a physician, Mr. Trent was found to be in atrial fibrillation. He was transferred to the cardiac unit of the local hospital so that he could be stabilized before returning for rehabilitation services.

10

During rehabilitation, the hip and pelvis were extremely painful. Mr. Trent could not get out of bed without screaming from pain. Nevertheless, he stated that he continued to do all the therapy he could tolerate. The elbow and arm were immobilized. Once the immobilization was removed, he had therapy for the elbow, but he did not see significant improvement. Mr. Trent demonstrated the difference of movement between his two arms.

Once he returned home, Mr. Trent testified that he received home nursing, therapy, bathing and hygiene assistance, and participated in outpatient physical therapy. Like Mrs. Trent, he testified that therapy records that indicate he can walk 500 to 1,000 feet are in error. He could easily do that before the accident, but not since his injury. Before the injury, he walked four miles a day at a brisk pace with friends at the mall. He is no longer able to do that, stating that now he can only walk about half a mile, and has to stop and rest.

According to Mr. Trent's testimony, he has not been able to draw cartoons because of his arm injury. He continues to have pain in his elbow. He wakes at night three to four times a week "seeing" the accident. He sees "what happened all the time."

On cross-examination, Mr. Trent testified that he saw two vehicles pass by, one of which was the truck, before he crossed the street to wait for the FedEx truck. He was adamant that he looked both ways before crossing the street. After crossing the street,

11

standing on the sidewalk, he turned away from the travel of the truck, to watch for the FedEx truck. Mr. Trent stated: "[l]et me tell you something. In three — three years, three months, and nine days that, that happened, I've been awake a thousand times reliving that scene. I know exactly what happened." Mr. Trent also acknowledged prior health issues including cardiac problems, a prior fracture of the arm years before, arthritis, hip pain, weakness, degenerative shoulder arthritis, hip, low back, and lumbar spine changes.

Dr. Richard L. Smith, II, is a board-certified cardiologist who saw Mr. Trent as a patient before and after the injury. It appears his testimony was offered because Roof Service disputed that the atrial fibrillation experienced by Mr. Trent as he was commencing his rehabilitation was related to the incident and injury. Dr. Smith testified that he began seeing Mr. Trent in 2011 and typically saw him about every six months. Mr. Trent had a post-operative atrial fibrillation following a surgery in 2011 which is a common event. According to Dr. Smith, Mr. Trent had not had a recurrence and had not been on medication for atrial fibrillation. However, after the injury at issue, surgery, and transfer to the rehabilitation facility, he required cardiac care and it appeared that he had a recurrence of his atrial fibrillation and had elevated cardiac enzymes which can be a marker of a heart muscle injury. Dr. Smith testified to a reasonable degree of probability that the incident of June 9, 2015, triggered Mr. Trent's June 17, 2015 arrhythmia. He testified that "it's very common to see atrial fibrillation, especially, you know, post traumatic injuries and post hospital injuries." He agreed that it was more likely than not that it was induced by the incident of June 9, 2015. Dr. Smith also stated that "it's well documented in the literature

that, you know, traumas, as well as other injuries or illnesses or significant sickness, is a very common trigger for atrial fibrillation."[2]

Dr. John C. France, an orthopedic surgeon, testified to the post-injury care, surgery, and treatment provided to Mr. Trent. He stated that Mr. Trent presented with a pelvic ring fracture which was treated non-operatively. Mr. Trent also presented with an open distal humerus fracture, meaning that the bone came through the skin, requiring surgical fixation with plates and screws. The surgery was complicated by the fact that Mr. Trent had years earlier broken his arm and had internal fixation that required bone to be cut away to access the elbow. He agreed that it was a very painful and a horrific injury for an eighty-one-year-old man to endure. Dr. France also testified that Mr. Trent had reached his maximum improvement.

Dr. France agreed that a man who could walk four miles a day prior to injury and who subsequently cannot walk more than 100 to 200 feet "potentially" may have walking problems related to the injury. He testified as follows:

---

[2] Dr. John Angotti, a board-certified internal medicine physician called as a witness for Roof Service, testified that he had been Mr. Trent's general physician for some twenty years. As to Mr. Trent's general physical condition, Dr. Angotti testified that he had high blood pressure, coronary heart disease, heart blockages, aortic stenosis, type II diabetes, kidney disease, rheumatoid arthritis, and osteoarthritis. At some point in the past, Mr. Trent had been on a low dose, non-narcotic arthritis medicine. He had some aches and pains, but nothing that limited his lifestyle. Dr. Angotti, in contrast to the cardiologist, testified that he did not believe the injury caused the atrial fibrillation due to the timing of the event and Mr. Trent's other health problems.

13

> With a pelvic fracture, I would not expect to create any additional problems for him. It should—he should return to normal. You know, there are some 81-year-olds who once they're injured go through a recuperation for three to six months, and there are patients that never quite get back to their original status, that's possible. We see that with hip fracture certainly.
>
> So it is possible that he never feels like he got his energy back, that whatever reserve he had was limited that he—it is possible that he doesn't feel like he's back to his normal self.

As to the continued limitations Mr. Trent has with walking, Dr. France stated on cross-examination that they were "probably not" related to the pelvic fracture. In further explanation, Dr. France testified:

> The only—the only way you could tie it to the incident would be to say you've taken an 81-year-old guy who was functioning beyond the average 81. And then when he became sick, and rehabbed and just recovery, he's never quite gained his robust nature. So from that standpoint, there could be kind of an indirect tie, but it's not directly related to the pelvic fracture which is well healed."

In response to questioning whether the injury precipitated the limitations with the arm and shoulder, Dr. France testified as follows:

> It's hard to know, because, you know, his shoulder is really arthritic like bone on bone. So it's hard to know. So, I can't assume his motion, you know, you know if he says he didn't have a shoulder problem, it is possible that with his elbow injury, rehabbing, using his shoulder, holding it immobile for a little while, that his arthritic shoulder would stiffen up and it would bother him more.
>
> Not necessarily a direct relation to the injury but as a result from rehabbing his arm, maybe he's aggravated his shoulder. That's very possible.

14

Dr. France also testified that while the shoulder arthritis was not caused by the injury, "an aggravation can occur at the time of an accident or in the course of his rehab from that accident." Dr. France explained that the issues are those of patient history which he did not get into with Mr. Trent at the time of treating the acute injury. Dr. France stated he did not have a pre-existing history. He explicitly testified that he would defer to the history. "[I]f he was sitting in here, I would have to ask him, you know, how much did your shoulder bother you? And he said it didn't bother me and then after that it bothered me since, then I would say that there was probably an aggravation of an underlying condition is—is what I would say."

Following the jury verdict in favor of Mr. and Mrs. Trent, Roof Service filed a motion seeking entry of judgment as a matter of law or, in the alternative, for a new trial, or, alternatively, for a remittitur of the damages award. Roof Service's motion was denied by order of the circuit court on February 15, 2019. It is from that order of the circuit court that Roof Service appeals to this Court.

## II. STANDARD OF REVIEW

Multiple standards of review are implicated in this appeal. With respect to the circuit court's ruling on the motion for a new trial this Court has found that "[a] trial judge's decision to award a new trial is not subject to appellate review unless the trial judge

15

abuses his or her discretion." Syl. Pt. 3, in part, *In re. State Pub. Bldg. Asbestos Litig.*, 193 W.Va. 119, 122, 454 S.E.2d 413, 416 (1994), *cert. denied sub nom. W.R. Grace & Co. v. West Virginia*, 515 U.S. 1160 (1995). In further explanation, this Court has held:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*State v. Vance*, 207 W.Va. 640, 641, 535 S.E.2d 484, 485, Syl. Pt. 3 (2000). "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218, 219 (1976). However, a new trial should not be granted "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *In re State Pub. Bldg. Asbestos Litig.*, 193 W.Va. at 124, 454 S.E.2d at 418. With respect to the specific trial errors alleged, "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 61, 511 S.E.2d 469, 472 (1998).

As to renewed motions for judgment as a matter of law, "[t]he appellate standard of review for an order granting or denying a renewed motion for judgment as a

matter of law after trial pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16, 17 (2009). The Court explained as follows:

> When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the West Virginia Rules of Civil Procedure [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine *whether the evidence was such that a reasonable trier of fact might have reached the decision below*. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, *the evidence must be viewed in the light most favorable to the nonmoving party*.

224 W. Va. at 1, 680 S.E.2d at 17, Syl. Pt. 2 (emphasis added). We have also held:

> In determining whether there is sufficient evidence to support a verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. Pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981 (1984).

With these standards guiding our review, we proceed to address the assignments of error.

17

## III.  DISCUSSION

## A. Respondeat Superior Doctrine

In its first assignment of error, Roof Service contends that the circuit court erred in failing to award judgment as a matter of law to it because there was no master-servant relationship between Roof Service and Mr. Wilfong with respect to Mr. Wilfong's activities collecting scrap metal at the jobsite of the Trent residence and, even if there was a master-servant relationship, Mr. Wilfong was acting outside the scope of his employment. Roof Service argues that the facts establish that at the time of the incident, Mr. Wilfong was in his own vehicle, his workday had concluded, he was not being compensated by Roof Service at the time of the incident, he was engaged in a personal effort at gathering scrap metal to later sell for his personal benefit, Roof Service did not financially benefit from the salvage activities, and Mr. Wilfong was beyond the supervision, direction, or control of Roof Service.

In opposition, Mr. and Mrs. Trent contend that there was a master-servant relationship existing for the purpose of imposing liability on Roof Service for the negligence of Mr. Wilfong and that Mr. Wilfong was acting within the scope of his employment. Mr. and Mrs. Trent point to the two decade long practice that Roof Service and Mr. Wilfong engaged in whereby he was able to select and retrieve scrap metal debris for his financial benefit from jobsites including that of the Trent residence. Roof Service had the contracts for work performed at jobsites, controlled the jobsites and knew and approved of Mr. Wilfong's activities at the jobsites so long as the debris was picked up,

18

the yards cleaned, and the trash removed. The argument is that the approval of the practice of collecting scrap metal was a bonus or reward for Mr. Wilfong's long and good tenure with Roof Service. Primarily, Mr. and Mrs. Trent point to the existence of the contract for services regarding the roofing construction performed at the home of Mr. and Mrs. Trent. The contract provided, in part, for "Reroofing residence Including: Removing old roofing clean-up and haul away." Cleaning-up and hauling away the debris was part and parcel of the job and what Mr. and Mrs. Trent were paying to have performed and completed by Roof Service.

This Court is required to consider the long-standing doctrine of respondeat superior which imposes liability on an employer for the acts of its employees within the scope of employment, not because the employer is at fault, but rather as a matter of natural justice and public policy. *Cochran v. Michaels*, 110 W. Va. 127, 131, 157 S.E. 173, 174 (1931). We have held as follows:

> An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable.

Syl. Pt. 3, *Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981).

Likewise, this Court has observed as follows:

> The universally recognized rule is that an employer is liable to a third person for any injury to his person or his property which results proximately from tortious conduct of an employee

acting within the scope of his employment. The negligent or tortious act may be imputed to the employer if the act of the employee was done in accordance with the expressed or implied authority of the employer.

*Griffith v. George Transfer & Rigging, Inc.*, 157 W. Va. 316, 324-25, 201 S.E.2d 281, 287 (1973).

We have previously held that "[w]hether an act by a servant is within the scope of his employment is determined by the relation which the act bears to the employment." *Cochran*, 110 W Va. 127, 157 S.E. 173, Syl. Pt. 1. Additionally, "[a]n act specifically or impliedly directed by the master, or any conduct which is an ordinary and natural incident or result of that act is within the scope of employment." *Id.*, Syl. Pt. 2. Analysis of the question of scope of employment mandates consideration of the circumstances including the character of the employment, the nature and character of the tortious conduct, and the time, place and purpose of the conduct. *Griffith*, 157 W.Va. at 326, 201 S.E.2d at 288. Furthermore, this Court has concluded that "respondeat superior should be liberally applied in favor of those who invoke it." *Zirkle v. Winkler*, 214 W.Va. 19, 22, 585 S.E.2d 19, 22 (2008) (per curiam) (citing *Cochran*, 110 W.Va. at 131, 157 S.E.2d at 174).

Roof Service argues that at the time of the injury, there was no master-servant relationship between Roof Service and Mr. Wilfong. Roof Service relies on the following test:

20

> There are four general factors which bear upon whether a master-servant relationship exists for purposes of the doctrine of *respondeat superior*: (1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative.

Syl. Pt. 5, *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990).

Applying the four factors from *Paxton*, Roof Service contends that it did not select or engage Mr. Wilfong for the purpose of salvaging scrap metal; did not pay him any compensation for his time spent collecting scrap metal; did not have the power to dismiss him for his personal conduct on his own time for his own benefit; and did not have the power to control him while he was operating his personal truck for his personal activities and benefit.

We observe that Roof Service acknowledged below that Mr. Wilfong was an employee and worked on the roofing project for the Trent residence. Indeed, Mr. Wilfong was a long-term employee and the project foreman. Nevertheless, Roof Services contends that there was no employment relationship in place at the moment of the injury to Mr. Trent. In considering the four general factors set forth in *Paxton*, we find that the evidence demonstrates that the job requirements for Mr. and Mrs. Trent's residence included the cleaning up and hauling away of all debris. Roof Service knew and allowed Mr. Wilfong to return to jobsites, including the Trent's home, for twenty-plus years for the purpose of

21

collecting debris that was required by job contract to be removed. The evidence also demonstrated that while Mr. Wilfong may have been "off the clock" and uncompensated with his normal hourly rate of pay at the time of the incident, Roof Service permitted the activity as a financial reward or bonus for having been a good employee of some thirty-five years. Regarding power of dismissal, part of Mr. Wilfong's job responsibilities were to clean up and haul away debris, such that Roof Service certainly would have the ability to discharge him for failure to complete the requirements of the job.

As to the determinative issue of power of control, the focus on Mr. Wilfong operating his own vehicle is misplaced in that it fails to allow for the fact that the jobsite was controlled by Roof Service and, at any time, it could have exercised control by rescinding the permission to access it and collect the debris. Moreover, Roof Service had the power or right to exercise control of the job and the jobsite by requiring all debris be placed in the Roof Service waste truck, rather than thrown on the ground for later removal. In addition to control being the definitive factor, it is also the right of control that matters, and not the exercise or use of the right of control. *Spencer v. Travelers Ins. Co.,* 148 W.Va. 111, 117, 133 S.E.2d 735, 739 (1963). The issue is driven by the facts and circumstances. In those instances where the evidence is conflicting, or where more than one inference can be drawn therefrom, the question is one of fact for jury determination. *Id.* at 118, 133 S.E.2d at 740. Our review of the evidence in the light most favorable to Mr. and Mrs. Trent as the nonmoving party, instructs this Court that the evidence is capable of more than one

22

interpretation and does not indisputably show that there was no master-servant relationship between Roof Service and Mr. Wilfong at the time he returned to the jobsite.

Turning to the question whether the tortious acts of Mr. Wilfong were committed within the scope of employment requires a similar analysis. Roof Service argues that Mr. Wilfong was in his own vehicle after the conclusion of the work day, his activities had nothing to do with his roofing work for Roof Service, he conducted no business for Roof Service after retrieving his personal vehicle, and he received no compensation for his personal activities. Rather, it is contended that Mr. Wilfong was on his own adventure for his own financial purposes.

Roof Service relies heavily on *Pratt v. Freedom Bancshare, Inc.*, No. 18-0180, 2018 WL 6016075 (W. Va. Nov. 16, 2018) (memorandum decision) wherein we concluded that an at-fault driver on his way to a board meeting was not in the scope of his duties as a board member of a bank on the day of the accident such that there was no vicarious liability to an injured third party under the doctrine of respondeat superior. The evidence in *Pratt* was that the driver was in his own vehicle, was on a routine commute on his way to the meeting, did not conduct or intend to conduct any bank business during the commute, was paid a flat fee for board-related activities whether he attended monthly board meetings or not, and was not provided mileage or travel expenses in connection with commuting to board meetings. We find *Pratt* distinguishable because Mr. Wilfong returned to the jobsite to gather scrap metal as permitted by Roof Service who controlled

23

the jobsite and because removing debris from the jobsite was part of Roof Service's contract with Mr. and Mrs. Trent such that the character of Mr. Wilfong's employment is necessarily linked with removing debris. He returned to the jobsite under the long-standing custom, practice, authority and permission of his employer, Roof Service. The circumstances are entirely different than a routine commute to a meeting.

Moreover, when we consider what the "relation of the act" of Mr. Wilfong in removing the debris "bears" to his employment, we are convinced that there is a nexus between the two. *See Cochran*, 110 W.Va. 127, 157 S.E.2d 173, Syl. Pt. 2. Indeed, at the time he spoke with Officer Collins, Mr. Trent stated that "I was having a new roof put on my house and I believe he was one of the *workers*." (emphasis added). The nexus was apparent at the scene. And, Mr. and Mrs. Trent were not advised by Roof Service of any use of unlicensed independent contractors and had not granted any third parties permission to come on their property and engage in any activities. We observe some similarities between the instant matter and the facts in *Cochran* where the injured party was struck from behind while walking along the edge of a public road. The driver was a salesman authorized to use an employer-owned vehicle and, at the time of the accident, had passengers in the vehicle under circumstances that had nothing to do with the employer's business. The defendant employer contended that the relation of master-servant did not exist at the time of the accident and he was therefore not liable. The Court concluded, "it is apparent that at the time of the accident the driver was not engaged directly in defendant's business, in a narrow and restricted sense; but, . . . the rule of respondeat superior is not

24

limited by such restriction." *Id*. at 132, 157 S.E. 173 at 175. The driver's mental attitude in not intending to further his employer's business was also not controlling. *Id*. The Court noted that scope of employment is not capable of precise definition and is largely a question of fact such that its determination may vary in light of all the circumstances. *Id*.

As in *Cochran*, Roof Service should have anticipated that allowing its employee, Mr. Wilfong, to return to Roof Service jobsites for the purpose of taking actions that Roof Service had contracted to undertake had risk attendant to it that could be suffered by third parties at the jobsite. *See also Zirkle v. Winkler*, 214 W.Va. 19, 585 S.E.2d 19 (2003) (per curiam) (reversing a holding of a circuit court that a newspaper company could not have any liability to pay compensation for injuries caused by a newspaper delivery driver, because the driver, who delivered some 200 newspapers each day on a motor carrier route and whose compensation was set by a document that indicated the driver was an independent contractor, was an independent contractor and holding that the issue of the newspaper's liability was a jury matter). We also consider that both the independent contractor defense and scope of employment arguments were perhaps undermined by the fact that Mr. Wilfong has no separate business or business license for the purpose of salvaging scrap. He also does not engage in the activity for or with anybody in the community other than Roof Service. *See also Levine v. Peoples Broad. Corp.* 149 W.Va. 256, 261, 140 S.E.2d 438, 442 (1965) (approving an instruction that "a mere deviation or departure from the usual and ordinary course and activities of their employment, even to accomplish some private purpose of his own in connection with the business of his

25

employer, does not of itself, as a matter of law relieve the employer of liability" and finding that scope of employment is a relative term and question of fact to be determined by the jury).[3]

Again, relying, in part, on *Pratt*, Roof Service also argues that the "going and coming rule" applies such that respondeat superior is not applicable. The "going and coming" rule originated in the workers' compensation jurisprudence and is set forth as follows:

> An injury incurred by a workman in the course of his travel to his place of work, and not on the premises of the employer, does not give right to participation in such [Workers Compensation] fund, unless the place of injury was brought within the scope of employment by an express or implied requirement in the contract of employment of its use by the servant in going to and returning from work.

*De Constantin v. Pub. Serv. Comm'n*, 75 W.Va. 32, 83 S.E. 88, Syl. Pt. 2 (1914).

This Court has found that "[t]he doctrine of respondeat superior is not typically applicable while [an] employee is coming or going to work." *Courtless v. Jolliffe*,

---

[3] We reject Roof Service's argument that *Falls v. Union Drilling, Inc.* 223 W.Va. 68, 72 S.E.2d 204 (2008) (per curiam) best demonstrates the circuit court's error in failing to grant it judgment as a matter of law. In *Falls*, the Court considered a matter where a motor vehicle accident resulting in a fatality occurred after the completion of the workday while the supervisor and subordinate employee were traveling from work to home. The plaintiff's theory of liability was grounded in allegations regarding excessive overtime requirements and involved mixing various tort concepts in a unique, but ultimately unsuccessful, effort to avoid having a wrongful death claim barred by the workers' compensation immunity statute. The facts and creative pleading attempts in *Falls* are not relevant to the instant analysis.

203 W.Va. 258, 263, 507 S.E.2d 136, 141 (1998) (per curiam). The reason for this is that in traveling to and from work, an employee "is being exposed to a risk that is identical to that of the general public." *Brown v. City of Wheeling*, 212 W.Va. 121, 126, 569 S.E.2d 197, 202 (2002) (per curiam). Notably, while the "going and coming rule" applies in those instances "where the only evidence linking the employer to the accident was the fact that the employee was coming or going to work, various nuances of the rule may serve to alter its application where additional evidence exists linking the employer to the accident." *Courtless,* 203 W.Va. at 263, 507 S.E.2d at 141. Significantly, the application of the "going and coming rule" may be altered by the facts such as "when the employee is rendering an express or implied service to the employer, or when there is an incidental benefit to the employer that is not common to ordinary commuting trips." *Id*. at 263, 507 S.E.2d at 141-42.

At the time of the motor vehicle accident in *Pratt*, the bank board member was found to be on a public highway, on a route of his own choosing, and not managing or administering any bank affairs in his commute to a board meeting. There was also no evidence showing that the bank "received some incidental benefit from [the] commute that was not common to ordinary commuting trips. *Pratt*, 2018 WL 6016075, at *4. We reject the notion that Mr. Wilfong is similarly situated to the driver in *Pratt* because the evidence showed that Roof Service received incidental benefit in the completion of removal of debris from the yard and that the return to their jobsites for debris removal was a common practice known to and authorized by Roof Service. Moreover, it cannot be said that Mr. Wilfong

27

was commuting on a public roadway at the time of the incident. Rather, he was backing the truck down the sidewalk at the Trent residence jobsite for the purpose of positioning the vehicle in the yard so as to load the debris. The accident scene diagram shows the truck on the sidewalk. These same facts apply to distinguish authority from other jurisdictions relied upon by Roof Service for the proposition that an employer is traditionally not liable for the automobile accidents of their employees while traveling to or from a worksite.[4] Given the evidence, it cannot fairly be said that Mr. Wilfong was traveling to the jobsite at the time he struck Mr. Trent. Rather, he was backing up a vehicle at the jobsite.

---

[4] Roof Service points to cases from other jurisdictions supporting the proposition that employees are not generally liable for automobile accidents involving an employee unless the employer's business was being furthered, the employee was directed by the employer, and the employee was within the scope of employment. We do not disagree with the proposition, but simply stating it does not negate consideration of the facts and circumstances. While it is not necessary to engage in an analysis of all the authorities cited, a few points suffice to demonstrate the relevance of facts. For instance, in *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 639 (Tx. App. 1993) the employee was found not to be in the course and scope of employment while returning from a lunch break. Similarly, in *Roberts v. H-40 Drilling Inc.*, 501 Fed. Appx. 759, 760 (10th Cir. 2012) the employee had left work and was on the way to a personal physician appointment. In *Freeman v. Hutson*, 738 So.2d 148 (La. Ct. App. 1999) the employee was on his way to the bank solely for personal purposes. In *Baptist v. Robinson*, 49 Cal. Rptr.3d 153 (Cal. Ct. App. 2006) the employee was in his vehicle for his own purposes when his employer's agricultural bin, which he was not authorized to have in his possession, fell from the vehicle and was stuck by a motorcyclist. The same may also be said of the citations to sections 233, 235, 237 of the Restatement (Second) of the Law of Agency (Am. Law. Inst. 2005) regarding reasonable connection between employee conduct and authorized period, employee's intent, and employee's temporary departure in space or time from the scope of employment. The facts and circumstances and the inferences to be drawn therefrom are determinative. *See* Syl. Pt. 3, *Cremeans v. Maynard*, 162 W.Va. 74, 246 S.E.2d 253 (1978) ("When the evidence is conflicting the question of whether the relation of principal and agent existed, and, if so whether the agent acted within the scope of his authority and in behalf of his principal are questions of fact for the jury.").

Accordingly, based upon the foregoing discussion, this Court concludes that the evidence was such that a reasonable trier of fact could have reached the decision below and, thus, the circuit court's ruling denying the Roof Service motion for judgment as a matter of law must be sustained.

## B. Failure to Exclude Certain Lay Evidence

In its second assignment of error, Roof Service argues that the circuit court erred in denying its motion in limine to preclude Mr. Trent from presenting evidence or argument concerning the permanency of his injuries and in failing to exclude evidence alleging that Mr. Trent's continuing physical limitations, including those of ambulating and in the lack of full range of motion and pain of his arm and shoulder, were caused by the injury. At the pre-trial stage the motion was grounded in the notion that the injuries were obscure such that expert testimony was required in order to prove causation. Once Mr. and Mrs. Trent's case rested, Roof Service also asserted that the orthopedic surgeon, Dr. France, could not testify to a reasonable degree of probability that Mr. Trent's difficulties walking were caused by the injury and, as to the arm movement problems and shoulder pain, Dr. France testified that Mr. Trent had pre-existing severe shoulder arthritis. Thus, it is argued that Dr. France contradicted the lay testimony and that there is no causal relationship between the incident and the allegations of the injuries claimed such that Mr. Trent's testimony, and that of the other lay witnesses, is insufficient to support a jury verdict.

In opposition, Mr. and Mrs. Trent point to their testimony and that of Mr. Tomes as supporting the permanent effect of Mr. Trent's injury. They argue that, given the nature of the injuries, lay testimony is sufficient to prove permanency. Additionally, they contend that when viewed in its entirety, Dr. France's testimony is supportive of their testimony and representations as to Mr. Trent's physical condition.

In addressing expert medical testimony regarding injury, this Court has explained:

> In many cases the cause of injury is reasonably direct or obvious, thereby removing the need for medical testimony linking the negligence with the injury. Additionally, "[d]irect testimony, expert or otherwise, is not always necessary to prove the causal connection between the negligence or wrong of a tortfeasor and the injury suffered by the victim. Circumstantial evidence may be sufficient." *Smith v. Slack*, 125 W.Va. 812, 818, 26 S.E.2d 387, 390 (1943). In other instances, medical testimony is warranted to establish the proximate cause link between the claimed negligence and injury.

*Totten v. Adongay*, 175 W.Va. 634, 639-40, 337 S.E.2d 2, 8 (1985).

The leading case in this jurisdiction addressing proof of permanency or future effect of an injury is *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974), wherein, after an extensive summary of prior jurisprudence, this Court held:

> Where an injury is of such a character as to be obvious, the effects of which are reasonably common knowledge, it is competent to prove future damages either by lay testimony from the injured party or others who have viewed his injuries, or by expert testimony, or from both lay and expert testimony,

30

so long as the proof adduced thereby is to a degree of reasonable certainty. But where the injury is obscure, that is, the effects of which are not readily ascertainable, demonstrable or subject of common knowledge, mere subjective testimony of the injured party or other lay witnesses does not provide sufficient proof; medical or other expert testimony is required to establish the future effects of an obscure injury to a degree of reasonable certainty.

*Id*. at 30, 210 S.E.2d 623, Syl. Pt. 11.

As a result of being struck by the pick-up truck, Mr. Trent sustained significant direct or obvious, multiple traumatic injuries including an acute comminuted or open fracture of the elbow with displaced fracture segments, a large abrasion to his right shoulder, acute fractures to the pelvis, wounds and bruising, and a traumatic-related cardiac event including atrial fibrillation requiring extended hospitalization, rehabilitation, home nursing and therapy services, and out-patient physical therapy. The testimony of Mr. and Mrs. Trent and Mr. Tomes regarding how he was before the incident, his treatment and rehabilitation course, and how he functioned by the time of trial was summarized *supra*.

Dr. France was called as a witness to explain the acute injuries suffered by Mr. Trent, to describe the surgical and orthopedic treatment provided, and to provide testimony that Mr. Trent had reached his maximum degree of improvement. Upon cross-examination, Dr. France stated that Mr. Trent's walking limitations were "probably not" caused by the incident. However, Roof Service fails to credit the testimony of Dr. France that the rehabilitation and recovery process can result in a previously active eighty-one-

31

year-old feeling that "he never quite gained his robust nature" such that there could be an "indirect tie" to the incident even though the fracture had healed. Dr. France further explained that with hip fractures in eighty-one-year-olds, health care providers "certainly" see "patients that never quite get back to their original status." Of course, it should go without saying, that without being struck and run over by a truck there would be no resulting traumatic injury, and thus, Mr. Trent would have no need for surgery or a rehabilitation and recovery process.

With respect to the issues regarding Mr. Trent's shoulder, Dr. France stated that arthritis pre-existed the incident and was bone-on-bone. However, he also testified that if there were no problems with it prior to the accident, it is possible that with the resulting rehabilitation and period of immobilization it would stiffen and bother him more. He testified that it is very possible that the rehabilitation aggravated Mr. Trent's shoulder. Significantly, Dr. France testified that these are matters of patient history that he simply did not discuss with Mr. Trent in treating the acute injuries. Importantly, the jury heard Dr. France testify that in order to take a history, he would simply ask Mr. Trent how much things bothered him before the accident. According to Dr. France, if the answer was to the effect that it did not bother him before the accident, but has bothered him since, then Dr. France would conclude that it was probably an aggravation of an underlying condition. What happened in the courtroom is that the jury heard the patient history.

Viewed in light of the totality of the testimony, we find that Dr. France did not contradict the lay testimony regarding the state of Mr. Trent's pre-and-post injury physical condition and the effect of the injuries following treatment, recovery, and rehabilitation. The cross-examination of Dr. France was a primary defense weapon to counter the lay testimony. A properly instructed jury, as this jury was, in connection with the direct nature of the traumatic injuries, can sort out complementary, equivocal, or contradictory testimony. The injuries suffered by Mr. Trent are not obscure such as those of cancers allegedly caused by a toxic exposure, cognitive challenges resulting from a closed head injury, or other similar injuries that are not readily observable or understood. The injuries described here are of the nature and kind that are direct and obvious and within the knowledge and experience of jurors. The evidence was sufficient that a reasonable jury could have considered the initial severity of the trauma suffered by Mr. Trent together with his treatment, recovery, and rehabilitation therapies and reasonably concluded that Mr. Trent did not regain his prior physical health and would not progress any further in recovery.

Accordingly, we find that the circuit court did not abuse its discretion in refusing to exclude the lay evidence of Mr. Trent's physical condition regarding his walking limitations and his movement and pain issues from the arm and shoulder.

## C. The Verdict Form

Roof Service's next assignment of error is directed at the verdict form. First, Roof Service argues that the circuit court abused its discretion in failing to include the independent contractor defense in the verdict form when that defense was consistent with the law and the evidence presented. Second, Roof Services contends that the verdict form did not correctly "set up the question of allocating fault with the question of whether there was evidence of plaintiff's own negligence."

In contrast, Mr. and Mrs. Trent assert that the circuit court directed the parties to attempt to agree and prepare a verdict form. Accordingly, Mr. and Mrs. Trent note that "a verdict form was redacted, upon request of counsel, and presented to the jury without objection." Additionally, Mr. and Mrs. Trent point to a question of the circuit court asking "[a]nybody—have you looked over the verdict form as amended? Is everybody in agreement with the verdict form?" Counsel for Roof Service responded: "[y]es." Mr. and Mrs. Trent also contend that the verdict form was consistent with the law, the evidence, and the instructions.

As this Court has concluded: "the criterion for determining whether [a circuit court's] discretion is abused is whether the verdict form, together with any instruction relating to it, allows the jury to render a verdict on the issues framed consistent with the law, with the evidence, and with the jury's own convictions." *Adkins v. Foster*, 195 W.Va.

566, 572, 466 S.E.2d 417, 423 (1995) (per curiam). Here, the issue of the role of Mr. Wilfong as an independent contractor was introduced into evidence through the examination and cross-examination of several witnesses, a complete and accurate instruction on the question of the independent contractor defense was given by the circuit court, and Roof Service was able to, and did, argue the question to the jury. Question one of the verdict form asked: "[d]o you find by a preponderance of the evidence that Bruce A. Wilfong was acting as an employee of Defendant, Roof Service of Bridgeport, Inc., within his scope of employment at the time of the accident in question?" The verdict form instructed the jury to check either "Yes" or "No." Plainly, the verdict form, together with the instructions of the circuit court and the evidence required the jury to consider the role and status of Mr. Wilfong in relationship to Roof Service. Likewise, the verdict form also provided for the apportionment of fault as to Mr. Trent. Specifically, once the jury answered the question regarding a finding of fault on the part of Mr. Wilfong in the affirmative, the jury was required to consider and apportion the fault among the parties. The jury concluded that 100 percent of the fault was apportioned to Mr. Wilfong and zero percent was apportioned to Mr. Trent.

Significantly, we observe that the question and the answer regarding the approval of the verdict form took place in the context of reviewing instructions and the verdict form prior to the giving of instructions and closing arguments. The circuit court order reflected that it did not reject the verdict form proposed by Roof Service, but, upon the objection of counsel for Mr. and Mrs. Trent, requested the parties to "come up with a

35

mutually agreeable verdict form." The circuit court commented that the transcript reflected agreement with the amended form as it was submitted to the jury. Our review of the record is consistent with that of the circuit court and Mr. and Mrs. Trent. Our review of the record does not indicate that an objection was made to what instead appears to be a mutually agreed upon verdict form. We are concerned that despite the representations of counsel for Roof Service at oral argument that an objection to the verdict form was properly made and preserved, we are unable to locate the same in the record. No citation to such an objection appears in either of the Roof Service briefs.

Accordingly, we find that the verdict form was consistent with the law and the evidence and furthermore, as there was no objection made to the verdict form, this Court cannot conclude that the circuit court abused its discretion in submitting the verdict form to the jury.

### D. Allocation of Fault

Next, Roof Service argues that the jury verdict should have been set aside because no fault was allocated to Mr. Trent "even though he admitted at trial that he did not look both ways before crossing the street and the investigating officer testified that [Mr. Trent] violated his legal duty to look both ways before crossing the street into the path of Mr. Wilfong's vehicle." In contrast, Mr. and Mrs. Trent assert that the evidence was that Mr. Trent was not crossing the street, but rather standing on the sidewalk in front of his

home awaiting the delivery of medicine for his hospitalized wife, when stuck by Mr. Wilfong as he was backing his truck on the sidewalk.

The argument of Roof Service requires this Court to accept Roof Service's narrow view of the evidence. Our review of the evidence, as summarized *supra*, compels the conclusion that Roof Service ignores evidence and reasonable inferences that may be drawn therefrom. The investigating officer's diagram depicted the placement of Mr. Trent's body partially on the sidewalk. The officer testified that Mr. Trent did nothing wrong and that Mr. Wilfong was cited and warned for improper backing of his vehicle. A review of the evidence shows Mr. Trent's repeated testimony that he looked both ways before crossing the street, standing up on the sidewalk and getting struck to the ground, backed over, and thrust out by the truck. Mr. Trent was firm in his conviction that he was struck after crossing the street and while standing on the sidewalk watching, in the other direction, for the delivery of his wife's medicine. Notably, Mr. Wilfong did not see Mr. Trent on either side of the street, crossing the street, or on the sidewalk. The record simply does not reflect any evidence tending to show that Mr. Trent was struck while crossing the street. Nevertheless, the circuit court instructed the jury that a pedestrian voluntarily attempting to cross a street in the path of a moving vehicle and who knew, or should have known, that the vehicle was near, is negligent and conversely, a driver of a vehicle has no duty to anticipate that a pedestrian might unexpectedly step into his vehicle's path. This matter is one appropriate for jury determination. *See Jividen v. Legg*, 161 W.Va. 769, 775, 245 S.E.2d 835, 838 (1978) (reversing grant of motion for a directed verdict for defendant

37

in action where plaintiff pedestrian was struck while crossing highway and when pedestrian testimony was that she had almost completely crossed the street and her foot was on the berm when struck in contrast to driver who claimed pedestrian was in the middle of the road and noting the case "begs for jury determination"); *Sydenstricker v. Vannoy*, 151 W.Va. 177, 150 S.E.2d 905 (1966) (upholding circuit court's denial of a motion to set aside a jury verdict and grant a new trial in an action for injuries sustained by a pedestrian when struck by a defendant driver at or near an intersection and finding that evidence presented a jury question as to whether pedestrian was guilty of contributory negligence as to look out in not seeing the vehicle and as to whether driver was guilty of negligence as to look out in not seeing pedestrian).

Given the facts developed through testimony, we reject the invitation to substitute our judgment for that of the jury's. Therefore, we find no error in the refusal of the circuit court to set aside the jury verdict for failure to apportion fault to Mr. Trent.

### E. Damages

Finally, Roof Service argues that the circuit court erred by failing to set aside the jury's awards of past general damages and future general damages for Mr. Trent and the award for loss of consortium for Mrs. Trent. Roof Service contends that the awards were redundant, excessive compared to similar awards in other cases, and against the clear weight of the evidence such that a new trial or remittitur is warranted. In contrast, Mr. and

38

Mrs. Trent generally argue that both their lives have been fundamentally altered by the injuries suffered by Mr. Trent.

This Court has long held that "[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl. Pt., *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977). There is no dispute as to whether the jury was properly instructed on general damages and consortium damages. The jury awarded $181,000 to Mr. Trent in past medical expenses, some $145,170.78 were stipulated to and the remainder represented medical expenses attributable to Mr. Trent's hospitalization for atrial fibrillation as a result of the traumatic injury and surgery. The jury also awarded Mr. Trent $250,000 for "[p]ast, present and future physical pain, mental anguish, and emotional distress" and awarded $250,000 for "present and future loss of enjoyment of life and diminishment of his whole person." As to Mrs. Trent, the jury found by a preponderance of the evidence that she suffered loss of spousal consortium and awarded her $250,000 for the loss. Loss of consortium refers to any loss of society, companionship, comfort, guidance, and advice. *See*, Syl. Pt. 1, *Shreve v. Faris*, 144 W.Va. 819, 111 S.E.2d 169, 170 (1959).

In discussing awards in personal injury actions, this Court has commented:

There is and there can be no fixed basis, table, standard, or mathematical rule which will serve as an accurate index and guide to the establishment of damage awards for personal

39

injuries. And it is equally plain that there is no measure by which the amount of pain and suffering endured by a particular human can be calculated. No market place exists at which such malaise is bought and sold.

*Crum v. Ward*, 146 W.Va. 421, 429, 122 S.E.2d 18, 23-24 (1961) (quotations and citations omitted). Accordingly,

A jury verdict in a personal injury case may not be set aside as excessive by the trial court merely because the award of damages is greater than the trial judge would have made if he had been charged with the responsibility of determining the proper amount of the award. This Court cannot set aside a verdict as excessive in such a case merely because a majority or all members of the Court would have made an award of a lesser amount if initially charged with the responsibility of determining the proper amount of the award.

*Sargent v. Malcomb*, 150 W.Va. 393, 401, 146 S.E.2d 561, 566 (1966).

The loss of enjoyment of life resulting from a permanent injury is part of the general measure of damages flowing from the personal injury and is not subject to an economic calculation. *Wilt v Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993). As this Court described:

[C]ompensation for [general damages] is never a true measure or a true compensation for what is lost, the task of awarding general damages is a uniquely human endeavor, not only calling upon the trier of fact to consider the host of factors unique to each individual case, but also requiring the trier of fact to draw upon the virtually unlimited factors unique to all of us as human beings. . . .

*Id.* at 49, 443 S.E.2d at 206 (quoting *Foster v. Trafalger House Oil & Gas*, 603 So.2d 284, 286 (La. Ct. App. 1992).

While the general and consortium damages do not lend themselves to precise calculation, the evidence at trial was abundant as to the post-injury change of life experienced by Mr. Trent. Mr. Trent spent some thirty-nine days hospitalized and in pain followed by the need for home health and nursing care followed by out-patient physical therapy. The evidence shows he was an active eighty-one-year-old man who enjoyed walking some four miles daily at the local mall. That activity has been lost to him as the evidence demonstrated that he can walk only short distances with the assistance of a cane. He is unable to perform activities he previously enjoyed such as taking care of his yard. Mr. Trent is unable to perform some of his previous household tasks such as taking the garbage to the street and assisting his wife with other activities of daily life. He is unable to sketch and draw cartoons as he used to do as a hobby. He has lost weight and has decreased energy. Significantly, he testified to suffering from troubling sleep problems due to being awakened by reliving the truck backing into him. The memory also plagues him during his waking hours.

Likewise, there was sufficient testimony of the loss of consortium suffered by Mrs. Trent. While no economic valuation of loss of household services was offered, none is required as consortium is more than loss of domestic services and losses of society and companionship are not reduceable to economic calculation. She was in the hospital at the time of Mr. Trent's incident. She was deprived of his regular daily visits and comfort during her recuperation from surgery. They could not offer comfort and care to one another during their respective recovery periods. They have had to adjust activities such as

41

changing church attendance practices, giving up almost thirty years of attending WVU football games due to the inability to climb the stairs, and ceasing decorating family graves at the holidays. She testified that Mr. Trent has been unable to help her with many of the household chores and that she has taken up others such as household finance activities.

Upon a review of the record, we cannot find that the damages awarded by the jury were either unsupported by the evidence, redundant, or wrongly based on passion, partiality, or prejudice. The testimony regarding Mr. Trent's previous health and lifestyle as well as the testimony regarding the significant injuries suffered and the nature of lifestyle changes together with the impact on Mrs. Trent, compel our conclusion that the verdict awards are not monstrous, enormous, unreasonable, outrageous, and do not demonstrate jury passion, partiality, prejudice, or corruption. In *Adkins v. Foster*, 187 W.Va. 730, 421 S.E.2d 271 (1992), the Court found a jury award of $222,133.00 not excessive when medical bills were $2,768.00. *Id*. at 731, 736, 421 S.E.2d at 272, 277. Likewise, in *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991), the Court concluded that a jury award of $207,000.00 was not excessive when the medical bills totaled $8,000.00. *Id*. at 747, 408 S.E.2d at 687. In *Strahin v. Cleavenger*, 216 W.Va. 175,190, 603 S.E.2d 197, 212 (2004) the Court found that it was unable to say that a jury verdict was excessive or outrageous when the intangible awards exceeded the special damages by a factor of seventeen. *Id*. at 190, 603 S.E.2d at 212. In the instant case, the combined figure for both Mr. Trent's general damages and Mrs. Trent's loss of consortium damages amount to about four times the medical bills; a factor that is not, on its face, excessive.

Accordingly, we find no error in the circuit court's conclusion that the jury's award of damages was not redundant, excessive, or against the clear weight of the evidence.

## IV.  CONCLUSION

For the reasons stated above, the February 15, 2019, order denying the motion of the Roof Service for judgment as a matter of law or, in the alternative, for a new trial in the above-styled matter is therefore affirmed.

Affirmed.